UNITED STATES of America, Plaintiff,

v.

Erickson ALVELO–RAMOS, Defendant.

Criminal No. 96–206 (JAF).

United States District Court,
D. Puerto Rico.

Oct. 23, 1996.

---

Warren Vazquez, Asst. U.S. Attorney, Guillermo Gil, United States Attorney, San Juan, PR, for Plaintiff.

Carlos A. Vazquez–Alvarez, Asst. Federal Public Defender, Lucien Campbell, Acting Federal Public Defender, San Juan, PR, for Defendant.

### ORDER

FUSTE, District Judge.

We have before us defendant's motion for suppression of statements resulting from an intervention made by the Puerto Rico Police force and the Secret Service of the United States on July 3, 1996. A hearing was held on October 18, 1996, and the court makes the following findings of fact.

### I.

### Facts

During the early days of July 1996, the Puerto Rico Police force had been investigating a number of individuals in the Toa Alta/Toa Baja, Puerto Rico, area, for their alleged involvement with illegal weapons connected to drug-trafficking crimes. As a result of the investigation, a number of arrest warrants

had been issued and, in particular, a search warrant was issued by a Commonwealth of Puerto Rico municipal judge, directed to the residence of Erickson Alvelo–Ramos. The affidavit in support of the petition for a search warrant clearly states that the Puerto Rico Police suspected Alvelo–Ramos of being involved with illegal weapons. He had also been connected to one Boschetti who allegedly was involved in the illegal cloning of cellular telephone numbers.

Because of the fact that federal law violations were suspected, the Secret Service accompanied the Puerto Rico Police agents at the time they carried out the search of Alvelo–Ramos' home.

On July 3, 1996, a number of Puerto Rico Police agents and Special Agent Cuevas, of the Secret Service, appeared at Alvelo–Ramos' home between the hours of nine and ten in the morning. They knocked and announced their intentions. Alvelo–Ramos refused entry and resisted. The Commonwealth agents forced their way into the home through the entrance that also serves as the garage area of the dwelling. As the agents entered, Special Agent Cuevas saw a red Mustang parked in the garage and, in plain view, he could see a cellular telephone on the passenger seat. After Alvelo–Ramos was handcuffed as a safety measure in preparation for the search, Special Agent Cuevas asked him who was the owner of the car. Alvelo–Ramos responded that the red Mustang was his. Immediately, Special Agent Cuevas asked him who was the owner of the cellular telephone in the car. Alvelo–Ramos immediately responded that the phone was his. A third question followed. Agent Cuevas asked Alvelo–Ramos how much he had paid for the phone. Alvelo–Ramos responded that he paid $20 for it. Agent Cuevas commented to Alvelo–Ramos that if he had only paid $20 for the phone, the phone had to be a clone. Immediately thereafter, a Puerto Rico Telephone Company employee who was also part of the search team examined the cellular telephone and confirmed that the same had a cloned number. At that point in time, Agent Cuevas identified himself as a Secret Service agent, arrested Alvelo–Ramos for a federal offense, and proceeded to read

him the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Puerto Rico Police agents did not find any other incriminating evidence—weapons or drugs—at Alvelo–Ramos' home.

Alvelo–Ramos now seeks to suppress the statements he made responding to questions posed by Special Agent Cuevas. He claims that at the time that he was reduced to obedience incidental to the search warrant, he was sufficiently detained so as to require the *Miranda* warnings as a prerequisite to any interrogation. Defendant alleges that the totality of the circumstances point out to the fact that Special Agent Cuevas' interrogation was directed to elicit incriminating responses. On the other hand, the government argues that Alvelo–Ramos' detention was one motivated by his unruly conduct and was only pending the execution of the search warrant, solely for the safety of the searching officers. The government claims that Special Agent Cuevas did not offend any recognized Fifth Amendment principles by asking the questions discussed and that the statements should not be suppressed. We find that one of the statements should be suppressed.

## II.

### *Legal Standard*

Before the custodial interrogation of a suspect, *Miranda* warnings are required. Two kinds of situations constitute custody: "[A] formal arrest or restraint on freedom of movement associated with a formal arrest," *Thompson v. Keohane*, —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (quotation marks and citations omitted). The latter requires an analysis of whether a reasonable person in the suspect's shoes would have understood the situation to involve a restraint on freedom of movement associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). There are several common markers of a custodial situation, some of which were outlined in recent decision by the First Circuit. *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). Other circumstances were laid out in

*Sprosty v. Buchler,* 79 F.3d 635, 641 (7th Cir.1996), cited by the First Circuit. *Ventura,* 85 F.3d at 711. As the First Circuit noted, the test for custody is a fact-intensive examination. *Id.* Having reviewed the factors used by different courts, we have extrapolated three that address the principal concerns in this area of the law.

██ First, we must determine "whether the suspect was questioned in familiar, or at least neutral surroundings," *United States v. Streifel,* 781 F.2d 953, 961 n. 13 (1st Cir. 1986), and the degree of police control over the environment in which the interrogation took place. *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993); *Sprosty,* 79 F.3d at 641. The number of law enforcement officers may clarify this first factor. *See Streifel,* 781 F.2d at 961 n. 13.

The second factor relevant to the custody determination is the degree of physical restraint placed on the suspect, and whether the suspect was advised or could have reasonably believed that he or she could interrupt prolonged questioning by leaving the scene. *Streifel,* 781 F.2d at 961; *Griffin,* 7 F.3d at 1518; *Sprosty,* 79 F.3d at 641; *United States v. Johnson,* 64 F.3d 1120, 1126 (8th Cir.1995).

A third factor is the duration and character of the interrogation and, in particular, whether there has been prolonged, coercive and accusatory questioning or whether the police have employed subterfuge in order to induce self-incrimination. *Streifel,* 781 F.2d at 961 n. 13; *Sprosty,* 79 F.3d at 641; *Johnson,* 64 F.3d at 1126.

██ Interrogation is the second part of the test to determine whether, because of custodial interrogation, rights to counsel and silence have attached. Fortunately, interrogation is more easily spotted than custody. If an officer should know that a question is reasonably likely to elicit an incriminating response, and a reasonable person would perceive the question as an interrogative one, there is an interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980); *United States v. Taylor,* 985 F.2d 3, 7 (1st Cir.1993).

## III.

### Analysis

The inquiry required is whether the defendants were subjected to a custodial interrogation that caused their rights to counsel and silence to attach. Turning to the first element, we find that a reasonable person in the suspect's shoes would have understood the situation to be a custodial one.

██ The first indicator of a custodial situation is whether the surroundings are familiar or neutral, *Streifel,* 781 F.2d at 961 n. 13, and the degree of police control over the environment in which the interrogation took place. *Griffin,* 7 F.3d at 1518; *Sprosty,* 79 F.3d at 641. The defendant was in his home at the time of the questioning, a familiar place indeed. However, the number of officers present points to the custodial nature of the situation, since there were approximately five uniformed officers in the defendant's home.

The second indicator is whether there was physical restraint placed on the suspect, and whether the suspect was advised or could have reasonably believed that he could interrupt prolonged questioning by leaving the scene. *Streifel,* 781 F.2d at 961 n. 13; *Griffin,* 7 F.3d at 1518; *Sprosty,* 79 F.3d at 641; *Johnson,* 64 F.3d at 1126. Since the defendant was handcuffed for the execution of the search warrant, there is no question that he was entirely subordinated to police control, *See e.g., Colorado v. Connelly,* 479 U.S. 157, 169 n. 3, 107 S.Ct. 515, 523–24 n. 3, 93 L.Ed.2d 473 (1986), despite the fact that this police control stemmed from the defendant's refusal to admit the officers into his house.

The third indicator is the duration and character of the questioning and, in particular, whether there has been prolonged, coercive, and accusatory questioning or whether the police have employed subterfuge in order to induce self-incrimination. *Streifel,* 781 F.2d at 961 n. 13; *Sprosty,* 79 F.3d at 641; *Johnson,* 64 F.3d at 1126. The questioning in the instant case was not prolonged at all, lasting approximately a minute. In *United States v. Pratt,* 645 F.2d 89 (1st Cir.1981), the First Circuit cited a string of cases regarding the length of time that may lead to a

conclusion of custody. *Id.* at 91. Of the cases cited, the only detention held to be custodial was for over an hour. *See United States v. García*, 496 F.2d 670 (5th Cir.1974). In the present case, the defendant was interrogated for only a minute before being placed under formal arrest, rendering the situation less custodial. In addition, the police employed no subterfuge. In sum, the only factor in favor of a finding of custody is the fact that the defendant was handcuffed. This fact so greatly increases the level of physical control that we find that the defendant was indeed in custody.

■ Having determined the defendant to have been in custody, we must ascertain whether the questions were interrogative. *Ventura*, 85 F.3d at 711. In the present case, three questions posed by officers must be analyzed. The first two questions regarding ownership of the car and the cellular phone were only incident to the search of the house pursuant to the warrant and were not directly related to the crime suspected. These questions were not likely to yield incriminating responses because the possession of a car and a cellular phone is entirely quotidian, and thus could not have been reasonably interpreted as indicia of criminal activity.

■ However, the last question regarding the cost of the cellular phone was likely to elicit an incriminating answer, such as the one ultimately given. The questioning officer should have been aware of the likelihood of self-incrimination, and Mirandized the defendant before posing the question. Given that the situation was custodial, the answer to this interrogative question must be suppressed, despite the fact that this suppression serves the defense little.

## IV.

### *Conclusion*

Accordingly, the defendant's statement made in response to the question regarding the price of the cellular phone is suppressed.

**IT IS SO ORDERED.**