USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1254 UNITED STATES, Appellant, v. AMADO FERNANDEZ-VENTURA AND MILAGROS A. CEDE O, Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jos Antonio Fust , U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Hill* and John R. Gibson,** Senior Circuit Judges. _____________________ _____________________ Demetra Lambros, Attorney, Department of Justice, with whom _______________ Guillermo Gil, United States Attorney, Antonio R. Baz n, ______________ ___________________ Assistant United States Attorney, and Nina Goodman, Attorney, _____________ Department of Justice, were on brief for appellant. Linda Backiel, with whom Gregorio Lima and Carlos Ram rez- _____________ _____________ _______________ Fiol were on brief for appellees. ____ ____________________ January 6, 1998 ____________________  ____________________ * Of the Eleventh Circuit, sitting by designation. ** Of the Eighth Circuit, sitting by designation. JOHN R. GIBSON, Senior Circuit Judge. Once again the JOHN R. GIBSON, Senior Circuit Judge ____________________ appeal of the United States in the case of Amado Fern ndez- Ventura and Milagros Cede o is before us. Fern ndez-Ventura and Cede o were indicted for failing to declare currency in excess of $10,000 brought into the United States, 31 U.S.C. 5316 and 5322 (1994), and for making false statements in a matter within the jurisdiction of the United States Customs Service, 18 U.S.C. 1001 (1994). Their motions to suppress statements they had made to the Customs officers at San Juan's international airport were granted on the ground that they had been subjected to custodial interrogation without the benefit of Miranda1 warnings. _______ We reversed the district court, United States v. Ventura, 85 F.3d _____________ _______ 708 (1st Cir. 1996) (Ventura I), and remanded for reconsideration _________ under the proper legal standard. The district court reexamined the record in light of our opinion and again suppressed the evidence for failure to comply with Miranda. The United States _______ appeals, and we again reverse. Fern ndez-Ventura flew from St. Maarten, Netherlands Antilles, to San Juan, Puerto Rico on November 12, 1994. The Customs Service had Fern ndez-Ventura's name on a computerized "lookout" list, due to his frequent travel between the two cities. After Fern ndez-Ventura cleared immigration, Customs inspector Rose Espada sent him to the secondary Customs inspection area, where Customs officers Eugene Fischer and Richard Rausch interviewed him and searched his bags. Officer  ____________________ 1 Miranda v. Arizona, 384 U.S. 436 (1966). _______ _______ -2- Fischer asked Fern ndez-Ventura whether he was bringing more than $10,000 cash into the United States, and Fern ndez-Ventura said, "No." He said he had about $8,000. Meanwhile, Officer Rausch found women's clothing in Fern ndez-Ventura's bag and asked him why he had it. Fern ndez- Ventura replied that the clothing belonged to his "mujer" ("wife" or "woman"), who was traveling with him. The inspectors asked Fern ndez-Ventura where she was, and he took Fischer to find her. Milagros Cede o, Fern ndez-Ventura's girlfriend, had already cleared the check point and was waiting inside the Customs enclosure. Fern ndez-Ventura beckoned to Cede o, and she returned with Fischer and Fern ndez-Ventura to the inspection area. As they walked, Fischer asked Cede o if she had more than $10,000 in cash, and she replied that she had about $9,000. Rausch searched Cede o's purse and found $9,500. Rausch then contacted a supervisor, H ctor Alvino, to ask for permission to search Fern ndez-Ventura. Rausch found $6,666 in cash on Fern ndez-Ventura. Alvino then became involved in the questioning. Alvino asked Fern ndez-Ventura who owned the $6,666, and Fern ndez-Ventura replied that the money belonged to his money exchange company. Alvino then asked who owned the $9,500 in Cede o's possession, and Fern ndez-Ventura said that money also belonged to the company. Fern ndez-Ventura said that he was president of the company.2 Alvino then sent for a special  ____________________ 2 Though Fern dez-Ventura and Cede o each had less than $10,000, the government contends that all the money belonged to one owner and is therefore aggregated. United States v. Fern ndez-Ventura, _____________ _________________ -3- agent to arrest Fern ndez-Ventura. The agent told Fischer to read Fern ndez-Ventura and Cede o their rights. They signed Miranda waiver cards. _______ The district court initially suppressed the statements made after Fischer asked Cede o if she was carrying any money. United States v. Ventura, 892 F. Supp. 362, 369 (D. Puerto Rico _____________ _______ 1995). The district court held that, since Fern ndez-Ventura and Cede o were not free to leave the interview, they were therefore in custody and entitled to Miranda warnings. The court wrote, _______ "Customs is an inherently coercive environment." Id. at 367. ___ The district court also relied on the officers' state of mind and their belief that they had a "promising theory of guilt." Id. at ___ 369. We reversed, holding that the district court erred in concluding that Fern ndez-Ventura and Cede o were in custody because they could not leave. We held: Individuals subject to routine traffic stops or customs inspections, circumstances which are not custodial, are rarely free to leave while being questioned by an officer. The relevant inquiry, however, . . . is whether there was an arrest or restraint on freedom of movement of the degree associated with a formal arrest. Ventura I, 85 F.3d at 712. We further stated that the district _________ court erred in considering the officers' focus on Fern ndez- Ventura and Cede o, which was not relevant to a Miranda inquiry. _______  ____________________ 892 F. Supp. 362, 370 (D. Puerto Rico 1995). -4- On remand, the district court reexamined the custody issue, looking at three factors: (1) the nature of the surroundings and the extent of police control over the surroundings; (2) the degree of physical restraint placed on the suspect; and (3) the duration and character of the questioning. United States v. Ventura, 947 F. Supp. 25, 29 (D. Puerto Rico ______________ _______ 1996). The district court held that the surroundings were indicative of custody because the officers sent Fern ndez-Ventura straight to secondary inspection without first going through primary inspection, and because there were "four uniformed officers with the defendants at all times, two of whom were armed." Id. at 30. The court conceded that neither Fern ndez- ___ Ventura nor Cede o was physically restrained, but held that the second factor nevertheless weighed in favor of custody because "they were unaware of any ability to leave and were in fact unable to leave." Id. Moreover, the court considered it very ___ important that Cede o had already cleared Customs when the officers asked her to return. Id. Finally, the court held the ___ duration of the questioning, approximately one hour and twenty minutes, was indicative of custody. Id. The court again ___ suppressed the statements made after Cede o was returned to the inspection area. Id. at 31. ___ The district court's conclusion that a person is in custody is a mixed question of fact and law, subject to de novo review. Thompson v. Keohane, 116 S. Ct. 457, 460 (1995). The ________ _______ district court's findings of historical fact concerning the -5- circumstances of the interrogation are reviewed for clear error. See Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996). The ___ _______ _____________ ultimate question is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson, 116 S. Ct. at 465 (internal quotation ________ omitted). The test is not applied mechanically, but in view of the totality of the circumstances. See id. at 466. We conclude ___ ___ that the district court once again applied this test erroneously. The most significant circumstance is that this incident occurred in the course of a Customs inspection at our nation's border. In the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders. See ___ United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). ______________ ____ "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for Miranda warnings." Ventura I, 85 F.3d at 711 _______ _________ (citations omitted). The Eleventh Circuit has stated, "[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into he country." Moya, 74 F.3d at 1120. ____ In its conclusion that the surroundings suggested the defendants were in custody, the district court placed great reliance on the fact that the officers skipped primary inspection -6- and took Fern ndez-Ventura directly to secondary inspection. We said in Ventura I that "even secondary inspection does not per se _________ ______ constitute custodial interrogation." 83 F.3d at 711. Accord ______ United States v. Pratt, 645 F.2d 89, 90 (1st Cir.), cert. denied, _____________ _____ ____________ 454 U.S. 881 (1981); Moya, 74 F.3d at 1120. Since secondary ____ inspection is not innately custodial, we fail to see how going directly to secondary inspection makes the questioning more coercive. As a practical matter, this likely reduces the total time the traveler has to spend in Customs, which makes the questioning less coercive, not more. The district court's opinion on remand stated that the surroundings were coercive because "there were four uniformed officers with the defendants at all times." 947 F. Supp. at 30. The government pointed out that the officers were not all present simultaneously. Espada delivered Fern ndez-Ventura to Fischer and Rausch, and then left. Fischer went with Fern ndez-Ventura to get Cede o, and as the three of them walked, Fischer asked Cede o what cash she was carrying. After Fischer found the $9,500 on Cede o, Alvino appeared on the scene. The district court changed its opinion on reconsideration to say that Fern ndez-Ventura and Cede o were "guarded by four officers during the course of this incident," 947 F. Supp. at 32 (emphasis __________________________________ added), but the court did not change its conclusion that there were too many officers. We conclude that the early involvement of Espada was inconsequential. The presence of the three others is not so unusual as to convert a Customs inspection into an -7- arrest. See United States v. Tajeddini, 996 F.2d 1278, 1281, ___ ______________ _________ 1288 (1st Cir. 1993) (three Customs officers present; no custody); United States v. Park, 947 F.2d 130, 132-33, 138 (1991) _____________ ____ (same), vacated in part on other grounds, 951 F.2d 634 (5th Cir. _________________________________ 1992). The district court also emphasized the fact that Alvino and Espada were armed. The court conceded on reconsideration that "guns were not drawn" during the incident. 947 F. Supp. at 32. The testimony at the hearing was that Espada and Alvino were required to be armed as part of their jobs. The presence of armed officers in this case was simply a part of the Customs routine and not an extraordinary circumstance. Though the district court conceded that Fern ndez- Ventura and Cede o were not subjected to physical restraint, it resolved the physical restraint factor against the government for three reasons: (1) the two were "in fact unable to leave," id. at ___ 30; (2) Fern ndez-Ventura was subjected to a pat-down search, id.; and (3) Fischer requested that Cede o return to Customs ___ after she had already passed through, id. None of these facts ___ bears the weight the district court placed on them. First, in Ventura I we specifically instructed the district court that it __________ could not infer that travelers were in custody because they were not free simply to walk away from Customs inspectors. 85 F.3d at 712. Yet, the district court exhibited the same reasoning on remand despite our explicit disapproval. Next, a pat-down search in a Customs inspection was insufficient to tip the scales -8- against the government in Pratt, 645 F.2d at 91, and there is _____ nothing unusual about the search in this case to give it greater importance here. Even though Cede o had passed through the inspection station, she had not left the international border area, with its attendant obligations to cooperate in the Customs process. Moreover, her traveling companion was still in inspection and she was apparently waiting for him. Therefore, her progress past the inspection area did not remove her from the Customs context. Cf. United States v. Wardlaw, 576 F.2d 932, 935 ___ _____________ _______ (1st Cir. 1978)(applying relaxed standard for search at international border where defendant not only cleared Customs, but also left the airport building before being called back to Customs). Finally, the district court found that the interrogation lasted one hour and twenty minutes. The district court held, "This time span ... far exceeds the length of time a reasonable person would endure without feeling restrained." 947 F. Supp. at 34. Even the finding of historical fact that the questioning took an hour and twenty minutes is problematic. The district court found that the interrogation began at 8:10 or 8:15, based on Rausch's testimony about the time of the pat-down of Fern ndez-Ventura. The court found the interrogation ended at 9:40 or 9:45, based on the times stated in the Miranda waiver _______ forms. Id. However, these do not appear to be the relevant ___ times, since the pat-down search occurred near the end of the -9- questioning. On the Miranda forms Fern ndez-Ventura and Cede o _______ indicated that they were not detained until 9:10. The record certainly does not indicate that there was protracted questioning after the pat-down search. Rather, the witnesses recounted a few straightforward questions, followed by a call for a special agent to come and arrest Fern ndez-Ventura and Cede o. Therefore, although the record may support the conclusion that one hour and twenty minutes (or more) elapsed during the defendants' encounter with Customs, it does not support the district court's inference that they were therefore subjected to "focused questioning for nearly an hour and a half." 947 F. Supp. at 30. Additionally, the district court held that the custody began when Fischer began to question Cede o. Id. at 31. This ___ occurred before the pat-down search, which the district court used as the beginning of the one-hour-twenty-minute period. We reject the circular reasoning using the lapse of time as a factor in determining that the two were in custody at a point before the one-hour-twenty-minute time period even began. Moreover, even if the questioning did take one hour and twenty minutes, we have already concluded that the other circumstances of the questioning were routine. The duration of the encounter is "never a singly determinative factor," Pratt, _____ 645 F.2d at 91, and the duration in this case was not extraordinary. We are not prepared to say Customs inspections cannot take this long without becoming an arrest, or even that a delay of this length is strongly indicative of arrest. See Park, ___ ____ -10- 947 F.2d at 133, 138 (no arrest where Customs inspection lasted three to four hours). We conclude that the factors cited by the district court do not distinguish this case from a routine Customs inspection so as to support the court's conclusion that Fern ndez-Ventura and Cede o were in custody. We remand for remand further proceedings in accordance with this opinion. -11-